I think we're ready to hear our first case, Midwest Operating Engineers v. Alkermes Public Limited Company. Good morning, Your Honors. May it please the Court, Doug Bonship Cohen Nolstein, Sellers & Toll for Lead Plaintiff Midwest Operating Engineers. Your Honors, at the end of the class period in this case, an analyst at Credit Suisse said it best. His headline was, Extent of Differences Between FDA and Companies Surprising. And he went on. He said it was surprising to us today to hear the amount of disagreement the FDA has on fundamental issues related to the 5461 program, such as how the study should have been designed and how many of the trials were actually positive and supportive of approval. We were also somewhat surprised by the relative optimism the Alkermes team still maintained for 5461, despite what were clearly significant objections that must have been voiced by the FDA during the development and review process. Your Honors, the extent of these differences between what the FDA told defendants and what defendants told investors is at the core of this case. And I'd just like to give the Court two examples of the alleged false statements, if I may. Here's the context for the first. On February 17, 2011, before the beginning of the class period, Alkermes had a pre-IND meeting with the FDA. The FDA told it that it, quote, voiced no objection to SPCD in a proof-of-concept study, but strongly encouraged Alkermes to seek feedback prior to initiating the trial if they intended to use the study to support an efficacy claim. And the briefing document tells us that Alkermes and the FDA agreed that this was to be a pure proof-of-concept study, that's a quote, at A288, and a quote, not intended to support efficacy at A310. And then the FDA reiterates its concerns in October 2013 and said that although SPCD appears to be reasonable, there's been no analytical proof for the validity of associated statistical analysis. But wasn't it — doesn't the briefing document indicate that the FDA was willing to consider this approach throughout the review process? Am I wrong about that? Your Honor, there was some degree of back and forth with the FDA throughout the process. But I think it's important to recognize that the FDA did plant fairly significant guideposts for Alkermes throughout the process. One of them was on this very issue, on SPCD, including because — and this is unique among the methodologies in this respect — Alkermes actually agreed with the FDA that at least as to study 202, this study would only be offered for proof-of-concept, not proof-of-efficacy. But then on November 11, 2014, Defendant Pops refers to that study publicly and says using a method called SPCD, we saw robust efficacy. On December 2, 2014, Defendant Pops says we demonstrated in clinical trials very powerful efficacy, and then Alkermes — Why were they prohibited from making that statement? They weren't prohibited from making that statement, Your Honor, but we allege more should have been disclosed in context, including that the study they were offering as proof-of-efficacy had indeed been agreed upon with the FDA that it would only be offered for proof-of-concept. Well, Defendant Pops also say on July 27, that said, this NDA will be the first NDA based on SPCD efficacy analysis, and there were disclosures that this approach was novel. It was possibly a significant breakthrough because it would deal with problems with placebos in psychiatric trials if it could be used, but it seems the FDA both understood it was not saying we're going to rule it out, and the company was disclosing that it was a novel new approach. That's correct, Your Honor, and I believe the FOEs used this example of cautionary language in their brief at 14, citing A829, but I would encourage the Court to look at that supposedly cautionary statement in context. The language referring to, according to Defendant Pops, was the 5461 NDA will be the first NDA based on SPCD efficacy analysis, but then he continues. He says, so I think that the FDA is well-versed in SPCD and its potential utility in psychiatric trials, and we discussed it with him for a number of years. So he says, I felt like we got what we wanted out of that interaction. So essentially, defendants follow, immediately follow, their cautionary language about the novelty of SPCD with the statement that the FDA is well-versed in it, and that Alper means, quote, got what it wanted out of it. Your Honor, there's a second example here that I think really brings home the point about the misleading nature of defendant statements in context. And here is the context for the second statement I wanted to bring to your attention. On February 13, 2017, Alper means had a Type C guidance meeting with the FDA. The FDA told defendants at that meeting that it had not previously accepted MADRS-6 as a primary efficacy endpoint, and that it was concerned that MADRS-6 omitted, quote, diagnostically and clinically important aspects of depression. The FDA went on. It said it did not agree with the strategy comparing the baseline MADRS-6 or 10 scores to the average of the scores from week three to the end of the efficacy period. But then three months later, Your Honors, on May 18, 2017, Erich, Alper means' chief medical officer, speaks about averaging. And he says, we believe the continuous measurement of efficacy across multiple time points is a more powerful and precise evaluation of a drug's efficacy profile. He also says that MADRS-6 focuses on the core mood symptoms of depression and may provide a more precise measure of antidepressant activity for patients. No indication, Your Honors, that the FDA had never accepted MADRS-6 before and had expressed concerns about whether it was adequate, the precise opposite of what Defendant Erich was saying publicly. And no indication, Your Honors. Excuse me. Counselor? Counselor? I thought Alper at least had publicly acknowledged that MADRS-6 had not been used as a primary endpoint before. And it was a novel approach. Your Honor, the disclosure that defendants depend on in regard to MADRS-6 is not until July of 2017. But time transpires between the meeting in February 2017 and when Alper meets. Counsel, it sounds to me like you want every discussion with the FDA to be immediately reported to the public. And it's an iterative process. There's a lot of uncertainty about all of this that goes on. And it would almost be misleading to me to try and disclose every little detail that goes on. I don't think that's the case. I think that, you know, there's been a lot of briefing about whether these statements are opinion statements. I think, as Your Honor pointed out in the Abramson decision, Omnicare tended to erase the distinction between opinion statement or not. But the key from Abramson, we submit, is that a statement, even of opinion, can be misleading by omission. If without providing critical context, it implies facts that can be proven false. In other words, the Court said, when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability can follow. And Your Honor, we believe that the critical context and the contrary facts were omitted here in context. That was a case in which there was a lot of definite statements being made about the efficacy of a study, and also the inherent outcome. This case is a different case. It's dealing with an ongoing iterative process, debates and discussion about a new kind of test study, the SBTD, and whether it will work or not. And the company is certainly entitled to use that approach to try it out. And the FDA was willing to let them do it, let them experiment with it. And I don't see, and that much was disclosed. Your Honor, there was certainly some back and forth. And to Judge Livingston's question at the outset, I would submit that there were, nonetheless, certain guideposts that the FDA put up. Again, as to averaging, the FDA said, this is at A284, we do not agree with the averaging strategy. It actually is even more emphatic at the advisory committee meeting on November 1st, that it wasn't a review issue, that they, in fact, did not agree. MAGRS 6, the FDA called, quote, not fit for purpose. That's in our complaint at paragraph 70. And again, the FDA agreed with Alkermes at the outset that SBTD was not to be used, at least as to study 202, as proof of efficacy, but rather proof of concept. I see my time has expired. Good morning, Your Honors. May it please the Court. William J. of Goodwin-Proctor for the defendants. At every turn, Alkermes cautioned the market that it was relying on an innovative study design. And at every turn, it cautioned the market that FDA had not accepted the elements of that study design before. As Alkermes and FDA were both saying, whether the FDA would do so would be a matter of review. Because the plaintiff, in this case, cannot identify anything that Alkermes said that is consistent with a strong inference of Sienter, the district court correctly dismissed the complaint. There are, of course, a number of other grounds on which we've argued that the My friend offered a couple of examples this morning. And I think that each of them, for each of them, the facts just don't bear out what my friend said this morning. And let me take Madras 6 in particular. For Madras 6, as I think he mentioned eventually, the company disclosed that And that's at page 829. July of 2017. That's correct. But he's focused in on representations that are made in the year before that he thinks misstates the fact that you already knew that some of your methodology couldn't be used for efficacy. What's your response? And I'll let you get back. I don't mean to distract you. But what's your – and I understand your point. I'm right at the language that you're quoting from because it's of interest to me. But what's your response to his assertion that you had a misrepresentation about the use of the methodology, the sequential design analysis for efficacy that they knew – that Alkermes knew – had to know back in 2016 that it was not going to be capable of using it for efficacy? It's a little hard to get efficacy out of this mask. I'll do my best to reply to the mask. So you're asking about the SPCD, the different study design. I'm happy to address that. First and most fundamentally, so SPCD was used in that study 202, which is the Phase II study, the first of these studies that we've been talking about. Based on that study, FDA granted Fast-Track designation for this medicine. And so the standard for Fast-Track is that the application or the prospective application demonstrates the potential to address unmet medical need. That's based on the study using SPCD. Now, the agency certainly had not said, we will accept SPCD, but it certainly had not said, we will not. That's Judge Walker's point, I think, is that this is a trip along the line. And I take it your argument is that no point in time did the FDA say, this is not going to work, it's over. There was movement along the line. In your view of the facts are that there was a debate about whether some of the methodologies you were going to use would work, but there was a progression towards potential approval. Right, there was a pathway. And just to focus on the legal standard, this isn't just about falsity or whether the disclosures are misleading, it's about scienter. It's about whether the defendants were highly unreasonable in believing that they had a pathway forward in saying so to the market. And so when you have encouraging signs from the FDA, such as the designation for Fast-Track, as well as cautionary notes, such as the fact that they had never accepted SPCD before and that whether they would accept it for proof of efficacy would be a matter of review, that's certainly an important cautionary point. But in each of the statements that Alkermes made to the market, both in its written disclosures and at each of the conference calls and so forth, Alkermes made clear that whether the agency would accept SPCD, as well as the couple of other design issues that my friend addressed, would be a matter of review. Could you specifically address returning back to the Modris 6 data? It does appear that, and correct me if I've missed something in the record, but the company publicly disclosed that the FDA disagreed with its use of that data in July 2017. But the FDA certainly voiced concerns. I mean, in February of that year, they were saying the agency has concerns that this data omits diagnostically and clinically important aspects of depression, yet those concerns aren't reflected in the 10-K that's filed around the same time. Why is that a problem for your position? I don't think that's a problem for a couple of reasons. So first of all, recall that the study 207 used Modris 6, but theretofore Alkermes had been relying on Modris 10 in its studies. And recall that in study 207, it also collected data on Modris 10 and made that kind of the hierarchical second endpoint. I'm going to use the wrong terminology, but they had a hierarchy of primary endpoints. They proposed having Modris 6 be the first of them, but Modris 10 be the second of them. Now, there's also the question about the use of averaging, which I'd like to bracket and come back to. So as the disclosure says all along, and of course this is all accompanied by cautionary language saying that FDA may disagree with our clinical trial design specifically, that language is repeated over and over, that when the agency said it was not going to use, it was not going to accept Modris 6, that's really the only definitive thing that we have in this record, and that's disclosed to the market. So I think if your Honor is asking, in between when the agency said that in a private meeting and when it's disclosed at the latest in July, I don't think the other side has suggested that there's any kind of loss causation during that period of time, that they've never suggested that when the July statement was made, the market reacted with shock and the stock price dip. Quite the contrary, I think they're saying that the July disclosure is inadequate, but we think the July disclosure just highlights how forthright Alkermes is being, that when the agency said something as definitive as we're not going to accept Modris 6 as your endpoint, they disclosed that to the market. They disclosed all along that we had been using Modris 6 in that one study, but that we've been collecting Modris 10 as well. Isn't your baseline here that the July disclosure, whether one can debate as to whether there should have been an earlier disclosure, but the July disclosure itself is not an indicia of CSA? That's exactly right. Not only is there no allegation that anyone was harmed by the disclosure not occurring until July, when you look overall at the way in which the company dealt with the FDA review process, including by disclosing the agency's unwillingness to use Modris 6 as the primary endpoint, that's just completely inconsistent with any strong inference of Center. This is a company that was optimistic about its product and hoped that it would get through the review process, but this was a design that had risks. Those risks were disclosed to the market, including the risks about averaging. The CEO specifically said to the market on the averaging point that averaging is central to our efficacy analysis in the same July 2017 call that we've been discussing. So you certainly can't say that they were hiding from the market that the use of averaging was important or that the FDA might not accept it. All of that is inconsistent with the notion of a strong inference of Center. I have a question about the overall cost of all these studies and meetings with the FDA and so forth. How much was invested in this work? I don't have the precise figure, Judge Walker. I'm sorry about that. I do know that clinical trials can cost in the tens or hundreds of millions of dollars for a full Phase III trial, but I don't have the specifics for these trials. But I think that does bring up the point that in discussions with the FDA, there's good reason why every sort of jot and tittle of an FDA meeting isn't made public, because these are commercially sensitive discussions. They are backed by significant investment, and the securities laws don't require that every detail of every FDA meeting be made public. And certainly the defendants in this case did not act with Center by what my friends characterize as failing to disclose. We, of course, dispute that. But the overall thrust of what Alkermes put out to the market promptly is completely inconsistent with the idea that they were concealing anything from the market. Counsel, if we were to agree with you but say that the district judge used his discretion or her discretion in not permitting the plaintiffs to amend, what would be your response? On that point, I think I would point you to the content of their request to amend, which has no content at all. It's just a boilerplate request for a leave to amend and a footnote. And to the fact that this is a consolidated complaint that was filed after a period of time to investigate. So, in other words, this wasn't the first complaint filed in this action. It's after the lead plaintiff was appointed. They had time to investigate. And given that, under the standard that this court used in Porat, it is abuse of discretion. And the plaintiffs – the plaintiff has never identified anything that they could use an amendment to cure. So, given that, there's – we think there would be no reason to consider what the judge – the district judge did in this case, an abuse of discretion. It's – it's really a case in which the primary – But we don't – we normally – we normally do permit amendments after the district At that point, there's no identification of all the problems as a general matter. So, I expect – I expect – anyway, I'll listen carefully to what your adversary says on this point. If I could, the case in which they relied, which is Loralee, it says that where the request gives no clue as to how the complaint's defects would be cured, it can be appropriate to – for the district court, within its discretion, to not leave to amend. I think that's exactly the case here. Unless the court has further questions, I see my light is out. Thank you, Your Honor. Thank you. Thank you. A few points, Your Honors. First one, cautionary language. Again, I think it's important that the court look at the examples of cautionary language that defendants are citing in context. Just to give another example of this, Apley's brief at 16 cites A762. Defendant Popp says we have positive studies and we have negative studies as well, and negative studies largely driven by high placebo response. But then he continues. He says, so in totality, we believe that the evidence supporting the licensure of 5461 is quite strong because even in the negative studies, you see signals of how the drug is behaving. So essentially, defendants say we have positive studies and we have negative studies, but even the negative studies are positive. Context matters a lot here, Your Honors. And as the court said in Abramson, when omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, the statement is misleading and actionable. And in Omnicare, Justice Kagan develops a little more the notion of what constitutes context. And one example she uses is when there's an information imbalance, when one party has special knowledge of the transaction and the facts are not equally known to both. This is that situation, Your Honors. The investors had no seat at the table with the FDA. This was only a dialogue between the FDA and Alkermes. Investors relied completely on what Alkermes conveyed to the public, and we submit that it was misleading in context. Counselor, you've indicated that you are allowed to amend the complaint. You would be able to come up with allegations. In other words, speculate your claim for slander here. What exactly would you do? Your Honors, drafting a complaint, as you know, is an exercise in judgment. And as we've seen the district court's opinion and in light of whatever this circuit's opinion may be, if we were to obtain an adverse ruling, we would want that to shape the facts we emphasize in drafting the complaint. There are additional facts in the briefing materials, the briefing document, as well as from the advisory committee's meeting on November 1st that we would include and emphasize. Could you tell the district court that that's what you would do? Your Honor, the opinion was issued and judgment was answered the very same day. I understand that, but did you have it in your footnote? Did you tell the district court that if you lost on the motion that you would like to replete it for the reasons stated and give the reasons why? We did not, Your Honor. And so what in the record – how are we supposed to divine this now in finding that the district court abused its discretion? Where are we supposed to pull these – your indications of what you would do? Where have you told anybody? Where do we find that in the record? I think that the – We can't, can we? The facts you will not find in the record, Your Honor. I think that – Counselor, in your brief to us, your reply brief to us, you said, if it were given a leave to amend, plenty could have cured any of the purported deficiencies identified by the district court. So you didn't have to wait for our ruling. You could have done it on the basis of the – put it in your brief, at least, what the district court's ruling – what effect the district court's ruling had on terms of deficiencies. But here's an example of that, Your Honor. I'm glad you – I'm glad you raised that. This is not in the record, but it's something we would add in light of particularly arguments about this being an ongoing back-and-forth with the FDA. At the advisory committee meeting on November 1st, the FDA said, and I'm quoting, we did not agree to the averaging strategy. It said we actually didn't say that it was a review issue. We said that we do not agree with your averaging strategy. That is an extremely firm statement and guidepost the FDA was setting up at the time, and we – that's an example of a fact that we would include if we were to replead. But I think the takeaway from it, lorally, is that a plaintiff should be given the opportunity to cure the deficiencies in its complaint in light of the district court's ruling, and that's not something that we had here. Thank you both, and we'll take the matter under advisement.